Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL XI

| | | |
|---|---|---|
| MUNICIPIO AUTÓNOMO DE BAYAMÓN representado por su Honorable Alcalde RAMÓN LUIS RIVERA CRUZ<br><br>Apelante<br><br>v.<br><br>JULIO E. PADÍN BASABE, TRINIDAD DEL CARMEN GÓMEZ GONZÁLEZ; CRIM<br><br>Apelados | KLAN202500185 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2022CV03331 (504)<br><br>Sobre: Expropiación Forzosa |

Panel integrado por su presidenta, la juez Brignoni Mártir, la jueza Álvarez Esnard y la jueza Prats Palerm.

Álvarez Esnard, jueza ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de junio de 2025.

Comparece el Municipio Autónomo de Bayamón ("Municipio de Bayamón" o "Parte Apelante") mediante una *Apelación Civil.* Nos solicita la revisión de la *Sentencia* dictada el 30 de noviembre de 2024, notificada el 6 de diciembre de 2024, por el Tribunal de Primera Instancia, Sala Superior de Bayamón ("foro primario" o "foro *a quo"*). Por virtud de la misma, el foro primario concedió la suma de trescientos noventa y seis mil ochocientos cuarenta dólares ($396,840.00) más los intereses acumulados en concepto de justa compensación por motivo de expropiación forzosa.

Por los fundamentos que expondremos a continuación, **confirmamos** la *Sentencia* apelada.

**I.**

El 22 de junio de 2022, el Municipio de Bayamón radicó una *Petición* sobre expropiación forzosa en la que incluyó al señor Julio E. Padín Basabe ("señor Padín Basabe" o "Apelado") y la señora Trinidad del Carmen Gómez González (señora Gómez González o

"Apelada") como Parte con Interés ("Parte con Interés" o "Parte Apelada", conjuntamente).[1] En síntesis, solicitó la adquisición en pleno dominio del siguiente bien inmueble perteneciente a la Parte con Interés:

> URBANA: Solar radicado en la calle Dr. Veve número 61 del Barrio Pueblo Norte. Con una cabida registral 346.70 metros cuadrados de terreno equivalente 0.088 de cuerda, y de 382.3556 metros cuadrados equivalentes a 0.0973 de cuerda según el plano de mesura realizado por el Municipio Autónomo de Bayamón a través del Agrimensor Carlos Fournier Morales con un número de licencia 21,195. En lindes de Bayamón por el NORTE, con solar del Municipio Autónomo de Bayamón, por el SUR, con la Calle Dr. Santiago Veve, por el ESTE, con solar perteneciente al Sr. Ismael Rivera Rivera, y por el OESTE, con KRS Corp.
>
> La predescrita se encuentra inscrita bajo el número de finca bajo el número de finca 9254; Registro de la Propiedad Bayamón Norte Sección III.
>
> ESTRUCTURA
>
> Estructura Número 61 dedicada a comercio conocida como "Salón de Actividades Los Artistas".
>
> Estructura de dos plantas construidas en bloques de hormigón y cemento reforzado con un área de construcción de 6,440 pies cuadrados.
>
> PRIMERA PLANTA:
>
> El primer piso dedicado a Salón de Baile, con un comedor, bar, cocina, almacén y dos baños.
>
> SEGUNDA PLANTA:
>
> La segunda planta cuanta con dos áreas de almacén y dos baños. Ambas plantas se encuentran en buenas condiciones.[2]

A esos fines, el Municipio de Bayamón estimó que la Parte con Interés recibiría doscientos catorce mil cuatrocientos veinticinco dólares ($214,425.00) en concepto de justa compensación. Sin embargo, precisó que descontaría diez mil quinientos setenta y cinco dólares con quince centavos ($10,575.15) por razón de una deuda ante el Centro de Recaudaciones de Ingresos Municipales (CRIM). A su vez, solicitó la expedición de una orden judicial para que se inscribiera a su favor el bien inmueble expropiado ante el Registro de la Propiedad.

---

[1] Véase, Apéndice de la Parte Apelante, págs. 245-248. Surge del expediente judicial que, el Municipio de Bayamón adjuntó a la solicitud de expropiación forzosa una serie de documentos, entre ellos, un escrito denominado el *Exhibit A* con la descripción del bien inmueble objeto del litigio.
[2] *Íd.*, pág. 248.

Con posterioridad, el 29 de junio de 2022, el Municipio de Bayamón sometió una *Moción de Consignación* a la cual anejó un cheque expedido a la orden de la Secretaría del Tribunal de Primera Instancia. De acuerdo con lo informado por la Parte Apelante, se consignó la suma de doscientos trece mil novecientos noventa dólares con cuarenta y nueve centavos ($213,990.49) en justa compensación.[3]

En reacción, el 17 de octubre de 2022, la Parte con Interés presentó su *Contestación a Petición de Expropiación Forzosa*.[4] En esencia, argumentó que la expropiación forzosa objeto del procedimiento judicial es inconstitucional. Sostuvo que el Municipio de Bayamón descontó la cantidad de diez mil quinientos setenta y cinco dólares con quince centavos ($10,575.15) del valor estimado de la propiedad por razón de contribuciones. Adujo al respecto que tal actuación constituyó una doble incautación. En vista de lo anterior, solicitó la consignación de la cuantía descontada.

Luego de una serie de acontecimientos procesales, el 27 de febrero de 2023, el foro primario dictó *Resolución*, notificada en igual fecha, en la cual resolvió que procedía conceder la autorización para efectuar la expropiación forzosa.[5] A esos efectos, decretó el siguiente pronunciamiento judicial:

1. El Título de Dominio Absoluto sobre la propiedad que aparece descrita en el Exhibt "A", que se ha hecho formar parte de la Declaración y anteriormente de esta Resolución quedó investido en el Municipio Autónomo de Bayamón desde el momento en que se radicó la referida Declaración de Utilidad Pública y se depositó en la Secretaría de este Tribunal la suma de doscientos catorce mil cuatrocientos cincuenta dólares ($214,425.00) por dicha propiedad. La referida propiedad queda expropiada, el Título de Dominio Absoluto sobre la misma queda investido en el Municipio Autónomo de Bayamón y el Derecho a una Justa Compensación por la propiedad adquirida queda a favor de las personas naturales y jurídicas que tuviesen derecho a dicha compensación, quedando la cuantía y distribución de éstas sujeta a determinarse en definitiva dentro de este procedimiento y

---

[3] Entrada número seis (6) del Sistema Unificado de Administración y Manejo de Casos.

[4] Véase, Apéndice de la Parte Apelante, págs. 269-271.

[5] *Íd.*, págs. 277-279.

mediante sentencia que en su día dicte este Honorable Tribunal.

2. El Municipio Autónomo de Bayamón tiene ahora el título de Dominio sobre la propiedad antes mencionada y a todos los fines la inmediata posesión y uso de la propiedad descrita en el Exhibit "A", la cual debe entregar materialmente las personas y/o entidades con interés, o en ausencia de éstas la persona o personas a cargo de dichas propiedades, a todos los fines y propósitos legales, al Municipio Autónomo de Bayamón por conducto de sus representantes autorizados, para lo cual este Tribunal concede un término de cuarenta y cinco (45) días, a partir de la fecha de la notificación de esta Resolución a las personas y/o entidades con interés o a las personas encargadas o que se encuentren al frente de dicha propiedad.

3. Esta causa quedará abierta para cualquier orden, resolución, sentencia o decreto que pudiere ser necesario dictar para el debido cumplimiento de y en relación con la misma.

4. El Registrador de la Propiedad correspondiente deberá inscribir a favor del Municipio Autónomo de Bayamón el derecho en pleno dominio sobre la propiedad, libre de toda clase de cargas, gravámenes, menciones, anotaciones, reservas, o defectos de cualquier naturaleza, excepto aquellos a favor del Estado Libre Asociado de Puerto Rico.[6]

Pendiente el asunto de la justa compensación, el 26 de septiembre de 2024, el foro *a quo* celebró el juicio para atender la controversia respecto a la valorización del bien inmueble expropiado. Ese día, comparecieron al procedimiento judicial (1) el señor Padín Basabe, (2) el tasador Javier F. Zayas Rivera, perito de la Parte Apelada ("tasador Zayas Rivera" o "perito de la Parte Apelada"), y (3) el tasador Víctor R. Isidor Rodríguez, perito de la Parte Apelante ("tasador Isidor Rodríguez" o "perito de la Parte Apelante").

Evaluada la prueba desfilada, el 30 de noviembre de 2024, el foro primario dictó *Sentencia,* notificada el 6 de diciembre de 2024, en la que concedió la justa compensación por motivo de la expropiación forzosa.[7] A la luz de la evidencia sometida, el foro primario formuló las siguientes determinaciones de hechos:

**JULIO E. PADÍN BASABE**

1. El Sr. Julio E. Padín Basabe declaró ser el dueño de la propiedad sujeto al momento de la radicación de la acción

---

[6] *Íd.*, págs. 277-279.
[7] *Íd.*, págs. 1-28.

de expropiación en este caso por el Peticionario. Es la Parte con Interés junto con su esposa. Leyó para el récord del Exhibit 3 Estipulado, que es la Escritura de Compraventa Núm. 9 la descripción legal de la propiedad sujeto.

2. Declaró que ocupó esta propiedad desde el año 2007 en calidad de arrendatario con el objeto de establecer el Salón de Actividades de los Artistas, para todo tipo de eventos como bodas, cumpleaños y que esta actividad era su fuente de ingresos. Este era el uso que se le estaba dando a la propiedad.

3. Pagó en canon de arrendamientos, $2,000.00, $2,500.00 y $3,000.00 durante los primeros tres años de su ocupación. Después por un período de ocho (8) años pagó $3,500.00 hasta que en el año 2018 adquirió la propiedad por la cantidad de $175,000.00, pero en total pagó durante la ocupación de todo este período desde 2007 año 2018 sobre $500,000.00. Desconoce lo que pagó hasta el último centavo por los dos negocios jurídicos (arrendamiento y compraventa).

4. A preguntas del interrogatorio directo declaró que sabe que el valor de la propiedad sujeto al año 2008 era de $370,000.00. Conoce de ese valor ya que ocupó la propiedad desde el año 2007 y en el año 2008 se mandó a tasar con el tasador Mario Carbia y obtuvo esa tasación.

5. Declaró que a la fecha de la expropiación la propiedad sujeto tenía varias mejoras. Tres meses antes le había dado tratamiento de techo a los casi 6,000 pies de construcción. Había cambiado las ventanas laterales y delanteras a ventanas de seguridad. Había pintado todo el frente del edificio. Estaba en proceso de remodelación arriba. Toda la parte baja era un salón abierto en el cual había una barra de treinta (30) pies.

6. Después del huracán María sufrió daños y cambió todos los techos acústicos. Se cambió una de las unidades de aires. La propiedad tenía puerta de emergencia. El primer nivel estaba excelente ya que estaba en operación total. El segundo nivel en proceso de remodelación.

7. El primer nivel estaba distribuido en un salón abierto de 3,400 pies cuadrados aproximadamente con mínimas columnas, un baño de caballeros con dos urinales y un inodoro. También tenía un baño de damas con tres inodoros, dos "storage", un área de distribución de comida hacia el salón en la parte trasera de emergencia.

8. En el segundo nivel había quitado todo el techo acústico y estaba quitando el vinil para poner losas de cerámicas. Todavía estaba haciendo reparaciones en este nivel.

9. En menos de un año había generado $72,000.00 refiriéndose al año de la expropiación.

10. Declaró que con la expropiación le quitaron su única fuente de ingresos proveniente del negocio, que se quedó totalmente sin ingresos de un negocio establecido de quince (15) años, que esa era la única fuente de ingresos para él y su familia.

**TASADOR JAVIER F. ZAYAS RIVERA**

Como parte de su desfile de prueba, el segundo testigo que presentó la Parte con Interés fue el perito tasador Javier F. Zayas Rivera, quien declaró sobre la metodología, principios y práctica de valoración seguidos por él en el desarrollo de su opinión de valor y que de ordinario siguen los demás tasadores en Puerto Rico. En consideración y peso a las

características de la propiedad sujeto, su mejor uso, enfoque y el propósito de su Informe de Valoración, la declaración de este perito en corte y, en base a la totalidad de la prueba desfilada y creída por este Tribunal, concluimos probados los siguientes hechos.

1. El tasador Javier F. Zayas Rivera preparó un Informe de Valoración para el Sr. Julio E. Padín Basabe y esposa que contiene su opinión de valor respecto a la propiedad sujeto. La fecha de efectividad de dicho informe es 29 de junio de 2022, fecha de radicación del caso de expropiación. El Informe de Valoración fue revisado el 2 de febrero de 2024 para incorporarse el plano de mensura del Peticionario.

2. Como parte de su testimonio, el tasador Javier F. Zayas describió ampliamente la propiedad expropiada según se encontraba al momento de la expropiación cuando no había sido transferida al Peticionario para la realización de su proyecto.

3. Al describir la propiedad y mediante su declaración en corte, el tasador Javier F. Zayas destacó las siguientes características del sujeto valorado.

     i. El sujeto ubica en el Núm. 61 de la Calle Dr. Santiago Veve en el casco urbano del pueblo de Bayamón frente a la Plaza de Recreo y la Iglesia Católica de dicho pueblo.

     ii. La propiedad trata de edificio de dos niveles y un área de "roof top" construido en concreto armado y bloques. El área superficial por niveles es 3,916 pies cuadrados para el primer nivel, 2,698 pies cuadrados para el segundo nivel para un total de 6,614 pies cuadrados de construcción y el "roof top" de 2,110 pies cuadrados.

     iii. Al momento de la expropiación se encontraba mejorado con una subestación eléctrica de 250 kilovatios que le da más valor a la propiedad debido a que el edificio puede tener operaciones más intensas que requieren más descargas eléctricas, por lo tanto, una subestación es favorable. El tasador Javier F. Zayas tomó en consideración esta subestación al valorar.

     iv. Al comparar un edificio que cuenta con una subestación 150 kilovatios con otro que no la tiene, el tasador Javier F. Zayas declaró que en términos de valor y de demanda es superior, recibe más demanda porque el edificio que la tiene cuenta con una gama mayor de clientes para poner ciertas operaciones dentro del edificio. Un edificio que no tiene una subestación es más limitado en usos, a lo mejor, por decir un ejemplo, no se puede operar una imprenta.

     v. El primer nivel tiene un "lay out" abierto típico de los "ballrooms" o salones de actividades, con espejos de diez pies en las paredes, área de barra, cocina, dos baños típicos de los salones de actividades que son con cubículos, uno para damas y otro para caballeros. Tiene cerámicas en todo el piso del primer nivel. El techo es parcialmente acústico y su altura de doce pies mientras que en el área del techo acústico es de diez pies con tres pulgadas, sigue siendo doce pies de alto, pero baja con el acústico. Al momento de la expropiación tenía aire acondicionado central.

La condición de este nivel era de promedio a buena.

vi. El segundo nivel tiene un "lay out" de cuatro habitaciones grandes y dos baños. Al momento de su visita estaba siendo usado como almacén de la utilería del salón de actividades, de mantelería de mesas, ese tipo de cosas. El 'lay out' de este edificio establecimiento permite el establecimiento de oficinas profesionales o de residencias. Tiene una altura de diez pies con diecisiete pulgadas, pisos en vinil y concreto, puertas en madera y el techo es de concreto con algunas áreas donde quedan los remanentes de un acústico. Tiene ventilación cruzada y no tiene aires acondicionados. Su condición es promedio a 'fair'. El primer nivel estaba en mejor condición, estaba operando. El segundo nivel necesitaba algunas ejoras.

vii. El "roof top" tiene área de 2,110 pies cuadrados de construcción. El tasador Javier F. Zayas sabe que lo tiene porque lo visitó. No es lo mismo un techo que un alero. Al "roof top" se llega por la misma escalera que por la que se llega al segundo nivel.

viii. El edificio cuenta con dos contadores eléctricos y dos contadores de agua que son unidades independiente.

ix. La capacidad del edificio es de ciento veinte (120) personas.

x. La topografía del sujeto es llana, su configuración es regular, la zonificación legal permite usos mixtos entre residencial y comercial ("RCM"), el acceso principal es por la Calle Dr. Santiago Veve y cuenta con otros accesos como la Avenida Comerío, la Carretera Estatal PR-6, la PR-16 y el Tren Urbano.

xi. En términos del casco urbano de Bayamón el sujeto queda en el mismo Centro. Justo al Norte del sujeto tiene la Plaza de Recreo y la Iglesia Católica.

xii. Aunque en la cabida del sujeto no hay estacionamientos, estos le quedan al frente, alrededor de la Plaza están habilitados y en las demás calles que se permite estacionamiento. Tiene estacionamiento público y privado alrededor.

xiii. El mantenimiento del área del sujeto es muy buena ya que Bayamón es uno de los pueblos que se mantiene bien.

xiv. El vecindario inmediato del sujeto está delimitado al Norte, por la PR-29 West Main Avenue. Al Sur, por la PR-; al Este, por la PR-167 y al Oeste, por la PR-168 o Cementerio Nacional Avenue.

xv. Al momento de la expropiación el mejor uso de la propiedad sujeto-valorada es comercial.

xvi. Al momento de la expropiación el sujeto tenía un uso también comercial.

4. Declaró que el establecimiento del vecindario por un tasador es importante ya que de ahí es que se escogen las comparables que deben tener unas características económicas, culturales y físicas similares; es donde se concentra la búsqueda de comparables.

5. Al valorar una propiedad hay que primero determinar su mejor uso. Se analiza todo posible uso y se escoge el mejor. El mejor uso tiene como criterios que el uso sea legalmente permisible, físicamente posible, financieramente viable y de todo eso, el que genere más valor y sea más provechoso para el sujeto.

6. El mejor uso es la espina dorsal de la propiedad porque de acuerdo con el mejor y más provechoso uso es que se hace la selección de comparables que debe tener un uso similar, un "highest and best use" similar.

7. Existen tres métodos de valoración que generalmente se utilizan para valorar una propiedad inmueble.

8. Los tasadores consideran el método de costo, el de ventas comparables y el método de ingresos para encontrar el valor en el mercado de la propiedad.

9. El valor en el mercado es el más probable al que se puede vender una propiedad donde tanto los compradores como vendedores están debidamente informados y asesorados y la propiedad debe haber sido expuesta u ofrecido en el mercado abierto.

10. El tasador Javier F. Zayas desarrolló dos (2) de los tres métodos de valoración. Estos fueron el método de ventas comparables y el método de capitalización de rentas o de ingresos. Descartó aplicar el método de costo ya que si fuera a construir la propiedad sujeto hoy día saldría sobre $730,000.00 el costo de construirla y ahora mismo hay propiedades sustitutas disponibles.

11. Declaró que al utilizar el método de ventas comparables es importante que las compraventas de propiedades similares se realicen antes de que comprador y vendedor fijen el precio de una propiedad.

12. Todas las compraventas que el tasador Javier F. Zayas están localizadas en el casco urbano de Bayamón al igual que el sujeto valorado.

13. Luego de describir las características de la propiedad valorada el tasador de la Parte con Interés continuó con los enfoques de valoración utilizados y entró en la etapa de la comparación directa. Escogió tres (3) ventas comparables y comenzó a declarar sobre su proceso de comparación para llevar las compraventas a igualdad con el sujeto. Estas compraventas y comparación son las siguientes.

14. La compraventa uno (1) ubica en el Núm. 36, esquina de las calles Manuel Rossi y Barbosa, en el pueblo de Bayamón. Trata de una transacción de compraventa privada donde vende Corporación para el Desarrollo de la Salud y compra Inmobiliaria Salud LLC. La transacción de compraventa se llevó a cabo antes de la expropiación, el 21 de marzo de 2021 ante el notario José Guevara Fuertes por la escritura núm. once. Se vendió por el precio de $500,000.00 esto es a razón de $68.00 redondeado por pie cuadrado de construcción. Trata de un edificio con área de construcción de 7,402 pies cuadrados, parecida a la del sujeto. Este edificio enclava sobre un terreno compuesto de 357.77 metros cuadrados muy similar al del sujeto. La proporción entre cabida del terreno y la edificación ("building land ratio") es de 192.28 por ciento. Es propiedad de esquina. Tiene dos niveles como el sujeto. Su zonificación es comercial liviano y las condiciones de la compraventa fueron las típicas del mercado.

En el proceso de comparación utilizó la vía cualitativa. Al ajustar la comparable para llevarla a igualdad con el sujeto ya que no existen dos propiedades iguales, la consideró similar al sujeto en los factores de localización ambas en el casco urbano de Bayamón y mismo vecindario del sujeto. Ambas son de dos niveles por lo que también son similares. El derecho valorado es igual, en pleno dominio. La zonificación es comercial, similar en ese aspecto. Tampoco tiene estacionamiento en su cabida, al igual que el sujeto. Ni es inundable como el sujeto. En tamaño del edificio y del terreno es muy similar al sujeto ya que el sujeto tiene 6,517 pies cuadrados la comparable uno tiene 7,402 y el terreno del sujeto 382.356 metros cuadrados y la comparable 357.77 metros cuadrados. En mejoras adicionales se consideró similar al sujeto ya que aun cuando esta propiedad tiene un elevador el cual se desconoce si existía al momento de la transacción de compraventa ya que fue visitada durante el proceso de valoración que fue en el año 2023, el sujeto tenía al momento de la expropiación una subestación eléctrica y las otras mejoras que antes se identificaron. Se consideró superior la comparable en que es un edificio de esquina y el sujeto no y en las condiciones generales del edificio al momento en que fue visitado que fue después de la expropiación. No obstante, las similitudes de esta compraventa con el sujeto, el tasador Javier F. Zayas la consideró superior por lo que al llevarla a igualdad con el sujeto ajustó negativamente el precio por unidad o unitario de $68.00 y lo redujo a $60.00 por pie cuadrado. En otras palabras, si la comparable se llevó a cabo por $500,000.00 a base de $68.00 por pie cuadrado al reducirse a $60.00 para llevarla a igualdad con el sujeto, esto nos da un valor ajustado de $444,120.00 para la comparable uno (1).

15. La compraventa dos (2) ubica en esquina de las calles Palmer, Maceo y Dr. Ferrer en el pueblo de Bayamón. Trata de una transacción de compraventa privada donde vende Inmobiliaria Marques de Cundeamor, Inc. y compra Brava Business Solution, LLC. La transacción de compraventa se llevó a cabo antes de la expropiación, el 4 de mayo de 2022 ante la notaria Anamar Menéndez González por la escritura núm. uno. Se vendió por el precio de $350,000.00 esto es a razón de $49.00 (redondeado) por pie cuadrado de construcción. Trata de un edificio con área de construcción de 7,195 pies cuadrados, parecida a la del sujeto. Este edificio enclava sobre un terreno compuesto de 445.50 metros cuadrados muy similar al del sujeto. La proporción entre cabida del terreno y la edificación ("building land ratio") es de 150.10 por ciento. Es propiedad de esquina. Tiene dos niveles como el sujeto. Su zonificación es comercial residencial mixto (RCM) igual que el sujeto y las condiciones de la compraventa fueron las típicas del mercado.

Al ajustar la comparable dos (2) para llevarla a igualdad con el sujeto el tasador Javier F. Zayas la consideró similar al sujeto en los factores de localización ambas en el casco urbano de Bayamón y mismo vecindario del sujeto. Ambas son de dos niveles por lo que también son similares. El derecho valorado es igual, en pleno dominio. La zonificación es mixta entre comercial y residencial igual que el sujeto. Tampoco tiene estacionamiento en su cabida, al igual que el sujeto. Ni es inundable como el sujeto. En tamaño del edificio y del terreno es muy similar al sujeto ya que el sujeto tiene 6,517 pies cuadrados, la comparable dos tiene 7,195 y el

terreno del sujeto es de 382.356 metros cuadrados y el de la comparable 445.50 metros cuadrados. En mejoras adicionales se consideró inferior ya que el sujeto tenía una subestación y "roof top" y la comparable no. Por otro lado, es muy inferior al sujeto en las condiciones en que se encontraba al momento de la transacción de compraventa ya que según declaró el tasador Javier F. Zayas cuyo testimonio mereció credibilidad, en entrevista con el comprador este tuvo que remover todo el piso en vinil, los acústicos, las unidades de aire, los conductos de aire acondicionado y al momento de la inspección de dicha propiedad el comprador estaba esperando por cotización para poder reemplazarlos. Al momento de la compraventa que fue un mes antes de la expropiación, la propiedad estaba inhabitable. Se consideró superior la comparable en que es un edificio de esquina y el sujeto no, pero en las condiciones generales del edificio se consideró inferior. Los atributos inferiores de esta compraventa son mayores que los superiores al compararla con el sujeto. Por lo que al llevarla a igualdad con se ajusta positivamente el precio por unidad de $49.00 indicado esto que el valor por unidad del sujeto debe ser mayor a los $49.00 por pie cuadrado. En otras palabras, si la comparable se llevó a cabo por $350,000.00 a base de $49.00 el pie cuadrado, al ser inferior al sujeto, para llevarla a igualdad con el sujeto, su precio debe ser ajustado hacia arriba con un valor mayor a los $350,000.00.

16. La compraventa tres (3) ubica en el Núm. 74 de la calle Dr. Santiago Veve en el pueblo de Bayamón. Trata de una transacción de compraventa privada entre la Sucesión de A. Agosto Quiles y AIEM Attorney & Councelors at Law PSC. La transacción de compraventa se llevó a cabo antes de la expropiación, el 25 de enero de 2022 ante el notario José Lebrón Durán por la escritura núm. cuatro. Se vendió por el precio de $165,000.00 esto es a razón de $36.00 redondeado por pie cuadrado de construcción. Trata de un edificio con área de construcción de 4,622 pies cuadrados. Este edificio enclava sobre un terreo compuesto de 100.00 metros cuadrados. La proporción entre cabida del terreno y la edificación ("building land ratio") es de 429.55 por ciento. Esta propiedad es la única de tres niveles muy distinta al sujeto que es de dos niveles. Su zonificación es comercial y las condiciones de la compraventa fueron las típicas del mercado.

Al ajustar la comparable tres (3) para llevarla a igualdad con el sujeto el tasador Javier F. Zayas la consideró muy inferior al sujeto en el factor localización ya que, aunque ubica en la calle Santiago Veve, el sujeto está localizado justo al frente de la Plaza de Recreo y de la Iglesia Católica que son lugares con vista o más vistosos. Es inferior en número de niveles ya que es de tres pisos mientras que el sujeto es de dos y el tercer nivel tiende a estar vacante y ser menos deseable que el segundo y primer nivel. Máxime si la propiedad de tres niveles no tiene elevador como la compraventa tres (3). Es inferior al sujeto en sus condiciones físicas debido a que en la parte lateral del edificio y en el tercer nivel le faltaban ventanas y las que tenía eran tipo miami de aluminio mientras que el sujeto tenía ventanas en todo el edificio y de seguridad en la parte frontal. En mejoras es inferior ya que el sujeto estaba recién pintado, contaba con mejoras adicionales como la subestación eléctrica y área de ¨roof top¨. En vecindario es similar al sujeto. El derecho valorado es

igual, en pleno dominio. La zonificación es comercial por lo que es similar. No tiene estacionamiento en su cabida, al igual que el sujeto. En inundabilidad es similar, no-inundable como el sujeto. En tamaño del edificio y del terreno es similar ya que la diferencia no es sustancial. Esta compraventa se consideró mayormente inferior al sujeto valorado. Los atributos inferiores de esta compraventa superan en grado los similares al compararla con el sujeto. Por lo que al llevarla a igualdad con se ajusta positivamente el precio por unidad de $36.00 indicado esto que el valor por unidad del sujeto debe ser mayor a los $36.00 por pie cuadrado. En otras palabras, si la comparable se llevó a cabo por $165,000.00 a base de $36.00 el pie cuadrado, al ser sustancialmente inferior al sujeto, para llevarla a igualdad con el sujeto su precio debe ser ajustado hacia arriba con un mayor a los $165,000.00.

17. El tasador Javier F. Zayas no realizó ajustes por cabida de terreno a ninguna de las comparables ya que en estas no quedaba espacio disponible que aprovechar para construir. Los edificios en estas, enclavados, cubrían prácticamente todo el terreno por lo que eran similar. Mayor cantidad de terreno es valioso si está vacante al igual que terreno disponible es superior en función de un uso que aporte valor, pero en estas compraventas el espacio fue aprovechado en su totalidad por lo que, sería una ficción ajustar por mayor cabida en función de espacio disponible.

18. En resumen, la comparable uno (1) se posiciona superior al sujeto con un unitario de $68.00; la comparable dos (2) se posiciona inferior al sujeto con unitario de $49.00 y, la comparable tres (3) se posiciona muy inferior con unitario de $36.00, todos los unitarios son por pie cuadrado de construcción. A base del análisis antes explicado, el tasador Javier F. Zayas ubica el valor del sujeto entre las primeras dos comparables. En otras palabras, entre los unitarios de $68 y $49 por pie cuadrado.

19. Luego de este proceso, el tasador Javier F. Zayas declaró que llegó a una conclusión de valor unitario en su Informe de Valoración de $60.00 por pie cuadrado de construcción para el sujeto y que se reafirma en su conclusión de valor. Conforme a ese valor unitario, el valor de la propiedad sujeto de 6,517 pies cuadrados y su "roof top" es de $396,840.00 que se redondea a $400,000.00 siendo este redondeo típico en valoración.

20. El tasador Javier F. Zayas también desarrolló en su Informe de Valoración el método de capitalización de rentas el cual explicó en detalles durante su interrogatorio directo. La propiedad sujeto tenía un uso comercial y generaba ingresos. El sujeto podía ser rentado o generar ingresos independientes proveniente de cada uno de sus niveles. Incluso, cuando se rentan independientemente usualmente se obtienen rentas mayores por pie cuadrado, pero para efectos del análisis tomó la decisión de considerar el sujeto como un todo, con la cabida total y no por niveles.

21. En este análisis seleccionó cinco (5) rentas de propiedades comparables en localización, zonificación, condiciones, estacionamiento, propiedad de esquina, tamaño y el término del alquiler en cuatro (4) de ellas ya que, la información de uno de estos no estaba disponible.

En la renta uno (1) el término del alquiler era por un año, en la renta dos (2) por cinco años, en la renta tres (3) por seis años y en la renta cuatro (4) por tres años. Luego, comparó las características de las propiedades rentadas con las del sujeto resultando esto en que el sujeto se encontraba entre la renta de la propiedad dos (2) con $10.85 por pie cuadrado y la renta cuarta (4) con $7.11 por pie cuadrado. A base de esto llegó a la conclusión de que el sujeto podía tener una renta de $8.65 por pie cuadrado para un total de $4,850.00 mensuales de alquiler. Si el unitario de $8.65 se multiplica por el área total de construcción del sujeto se llega a un Ingreso Bruto Potencial de $58,197.20. A esto el tasador Javier F. Zayas le restó un porciento estimado por vacantes o pérdida de rentas de 10% lo cual, resulta en un Ingreso Neto Efectivo de $52,377.48. Este resultado también se ve reducido por los gastos operacionales que consisten en gerencia, contribuciones de la propiedad, seguros, mantenimiento y una reserva para reemplazos. Estos gastos totalizaron $12,415.46 y al restarse del Ingreso Bruto Efectivo de $52,377.48 da un resultado de $39,962.02 que es el Ingreso Neto Operacional ("NOI" por sus siglas en inglés).

En la segunda parte del desarrollo del método de capitalización de rentas, se debe encontrar la tasa de capitalización que es la que resultará en el valor presente de la propiedad que genera ingresos. Existen varias formas aceptadas de extraer la tasa de capitalización. En el análisis consideró extraer la tasa directamente del mercado. En este caso obtuvo otras cinco (5) compraventas ocurridas entre los años 2022 y 2021 en el pueblo de Bayamón con sus NOI. Para obtener la tasa de capitalización del mercado, dividió el NOI entre el precio de compraventa de esas propiedades y encontró que la tasa de capitalización oscilaba entre 8.15% y 13.25% siendo el promedio 10.56%. El sujeto tiene una taza de capitalización de 9.99% al dividir su NOI de $39,962.12 entre el valor resultante del método de ventas comparables que es de $400,000.00 ($39,962.12/$400,000). Esta tasa de 9.99% se encuentra dentro de la tasa de capitalización del mercado y del "Realty Rates Investor Survey" (4th Qrt de 2022) que oscila entre 4.75% y 18.22%. Esta tasa de capitalización de 10% se encuentra incluso por debajo de las ventas extraídas del mercado. Bajo esta tasa se elimina parte del riego de generar vacantes por ser menor al 10.56 % que estimó el tasador del Peticionario. Por lo tanto, esta tasa de capitalización de 10% que se divide entre el NOI de $39,962 resulta en un valor de $400,000.00 para el sujeto lo cual, en este caso, corrobora el mismo valor obtenido bajo el método de ventas comparables que también fue de $400,000.00.

### VÍCTOR R. ISIDOR RODRÍGUEZ

1. El tasador del Peticionario, Víctor R. Isidor Rodríguez, igualmente utilizó el método de ventas comparables para emitir su opinión de valor sobre el sujeto. Declaró que la propiedad está localizada en el Núm. 61 de la calle Dr. Santiago Veve, que estaba de acuerdo con la descripción legal de la propiedad a base de su escritura de compraventa y que esa fue la propiedad que valoró llegando a un valor de tasación de $254,000.00 después de la enmienda en cabida.

2. Declaró que el método de ventas comparables es el método por excelencia, que se utilizan ventas comparables que se hayan vendido y que sea lo más

próximos a la fecha efectiva de la valoración y que hayan sido lo más similares en diferentes aspectos físicos, área, económicos, todos los factores que puedan afectar una propiedad.

3. Sin establecer para el récord mediante su declaración, las características del sujeto como base esencial para la comparación, declaró que utilizó cinco (5) compraventas en su Informe de Valoración que consideró las más similares y cercanas.

4. Igualmente, sin que se le preguntara nada antes de entrar a la página 46 de su informe, declaró directamente sobre características de sus compraventas.

5. La compraventa uno (1) ubica en la calle Dr. Veve, esquina Degetau Núm. 9 en el pueblo de Bayamón. Compró Adalberto Mercado, vendió José Pérez Córdoba, se vendió después de la expropiación el 9 de septiembre de 2022 por el precio de $240,000.00 equivalentes a $36.13 por pie cuadrado. Los datos legales no se mencionan. Consta de un edificio de 6,643 pies cuadrados sobre un terreno con cabida de 281 metros cuadrados. La propiedad esta a unos 50 metros del sujeto. Tiene las mismas facilidades y servicios del sujeto pues están en la misma zona, electricidad, agua, cable, internet los típicos del área, tiene acceso por dos calles Dr. Veve y Degetau, zonificación comercial liviano, uso vacante a ese momento con mejor uso comercial. Tiene de mejoras adicionales un "mezzani" en primer nivel de 735 pies cuadrados y balcones que consideró adicionales y no parte del edificio.

6. Compraventa Núm. Dos (2) ubica en la Calle Dr. Veve, esquina Martí, Núm. 41 Barrio Pueblo en Bayamón, indicó que tiene unos datos legales que no menciona, el comprador fue Raymond Hernández Laboy y el vendedor A&R Real Estates LLC y ocurrió el 21 de septiembre de 2022 después de la expropiación. El precio de compraventa fue $565,000.00, con cabida de 686 metros cuadrados y estructura de 14,711 pies cuadrados de edificación con precio unitario de $38.41 por pie cuadrado de construcción. Mejor uso mixto, comercial primer nivel y cuatro apartamentos residenciales en el segundo nivel, goza de facilidades y servicios de cualquiera. Se calcula en base al área de pie cuadrado.

7. Venta comparable Núm. Tres (3) está en la calle Palmer, Maceo y Dr. Ferrer Núm. 22 del Barrio Pueblo en Bayamón, esa fue el 4 de mayo de 2022, se vendió por $350,000, su cabida es 445.4 metros cuadrados y el área de estructura 7,195 pies cuadrados con unitario de $48.64.

8. Pasando a la página 52 de su informe y refiriéndose a la comparable Núm. cuatro (4) declaró que localiza en calle Betances esquina Degetau Núm. 4 barrio Pueblo Bayamón, en el mismo bloque del sujeto, pero en la parte de atrás. De mejor uso mixto comercial y residencial, tiene unos datos legales, compra Ángel Díaz Santana vende Sucesión Ortiz, queda a unos 10 o 20 metros del sujeto, el precio fue de $150,000.00 con cabida de terreno de 219 metros cuadrados y estructura de 3,863 pies cuadrados, el unitario por estructura que es en base a lo cual se va a hacer el análisis es de $38.83 pies cuadrados. Tiene calificación comercial liviano y mejor uso mixto comercial residencial.

9. La venta Núm. cinco (5) según declaró, queda en la calle Dr. Veve del Barrio Pueblo de Bayamón con datos legales "varios" el comprador fue AIEM Attorney & Counselor at Law PSC, vendedor Sucesión A. Agosto Quiles, fecha 25 de enero de 2022, precio pagado $165,000.00, la cabida del terreno es 149.73 metros cuadrados y área estructura 4,806 pies cuadrados y el unitario en base a estructura y precio $34.33 por pie cuadrado.

10. Luego de esta descripción somera de las compraventas seleccionadas pasó a la comparación de las compraventas con el sujeto según la página 4 del suplemento.

11. El tasador Víctor R. Isidor declaró que al igual que el tasador de la Parte con Interés utilizó el método cualitativo para comparar donde no hace ajustes en cantidades, sino que evalúa las características cualitativamente si es superior, inferior o similar a la propiedad sujeto y al final se tiene un parámetro general de si es inferior, superior o similar.

12. En el caso de la compraventa uno (1) es superior al sujeto en localización y/o exposición por ser de esquina, similar en que no es inundable, en tamaño similar el sujeto tiene 6,517 pies cuadrados y la compraventa 6,443 pies cuadrados. Declaró que el edificio ocupa la totalidad, básicamente el 100% del terreno. La condición física en que se encontraba esta compraventa era muy inferior al sujeto, el comprador estaba haciendo reparaciones en el techo del primer piso porque tenía unas varillas expuestas y él las había sacado, las reparaciones del sujeto en el segundo nivel eran menores. La compraventa uno (1) requería de reparaciones mayores, por eso en comparabilidad la pone muy inferior y pone dos veces el signo de "+". En mejoras adicionales superior por el "mezzani" y balcones. A pesar de indicar que el edificio ocupa casi el 100% del terreno al igual que el sujeto, hizo ajuste por cabida de terreno encontrando que la compraventa es inferior y que el sujeto en eso era más deseable al tener mayor terreno, como si hubiera algún espacio libre que aprovechar en estas propiedades desde el punto de vista de su mejor uso.

13. En la compraventa dos (2) es similar en localización y exposición porque es de esquina y el sujeto no, pero está localizado frente a la Plaza de Recreo lo cual al igual que el tasador Javier F. Zayas, entiende que es un "plus" por lo que las consideró similares. En otras palabras, una y otra tienen sus atributos en localización y exposición que se equiparan. La comparable es muy inferior en tamaño ya que es de 14,711 pies cuadrados y el sujeto 6,517 pies cuadrados. Según el tasador del Peticionario esta propiedad se vendió por "$300,000 y algo mil dólares el año anterior" y luego de habérsele hechos muchas mejoras tuvo la reventa por ese valor de $565.000.00. Por eso la encontró muy superior al sujeto en cuanto a condición.

14. La venta Núm. tres (3) la consideró muy superior al sujeto por ser de dos esquinas con tres calles. En total la cualificó, sin entrar en otro elemento de comparabilidad, superior al sujeto.

15. La compraventa Núm. cuatro (4) la consideró similar en localización y exposición porque al igual que el número dos (2) es de esquina, pero no está frente a la Plaza de Recreo, por un lado es superior y por el otro inferior, por eso la consideró similar. En inundabilidad es similar, en tamaño declaró que hay diferencia ya que "esta tiene 3,883 versus 6,500 del sujeto por eso la considero aquí

inferior". Luego se corrigió y expresó que "al ser más pequeña, igual que horita dije o al ser menor el costo por pie cuadrado viene a ser más alto cuando es menor por eso la considero superior al costo por pie cuadrado". En cuanto a mejoras adicionales la encontró similar. Respecto al tamaño del terreno inferior por ser más pequeño de 219 metros cuadrados versus 382. Indicó "cuando uno compara una propiedad uno compara terreno y estructura no es solamente la estructura, por ende en terreno tú tienes una mayor aprovechable un terreno, algunos espacios adicionales lo cual pudiste hacer la construcción en la cual la tienes, en el cual tu decidiese como muchas veces sucede por ejemplo en el casco urbano que demuelen un edificio para utilizarlo de estacionamiento tú vas a tener mayor terreno, que es mayor deseable que el mercado paga más por una propiedad que tenga más terreno que una propiedad que tenga menos terreno". Esto aplicaría si ambos terrenos estuvieran vacantes y sin estructura no cuando están construidos en su totalidad como es el caso del sujeto y las compraventas seleccionadas.

16. La compraventa cinco (5) en localización la encontró inferior por no estar frente a la Plaza de Recreo, no queda de esquina exactamente, no tiene a dos calles tampoco es de esquina. Es inferior en inundabilidad ya que aparece en los mapas de FEMA de inundabilidad como zona inundable. En tamaño del edificio la consideró superior, es menor y el costo por unitario tiende a ser mayor. En condiciones es similar porque tenía unas mejoras que había que hacerle -las cuales no identificó- estaban también remodelando. Indicó que en el casco urbano es difícil encontrar una propiedad a la que no haya que hacerle algo y muchas veces cuando se compra hay que adaptarla a tu estilo. En el caso de la compraventa uno (1) había una diferencia bastante grande porque había que hacer un gasto adicional para poderla poner en condiciones habitables. Regresando a la compraventa cinco (5) declaró que era inferior en cabida porque esta solo tiene 140.73 metros cuadrados.

17. En resumen, los precios ajustados para las compraventas fueron: $36, $38, $49, $39 y $34 para las compraventas que van de la Núm. uno (1) a la Núm. cinco (5) respectivamente.

18. El tasador del Peticionario declaró que no utilizó la comparable uno (1) del Informe de Valoración del tasador Javier F. Zayas porque encontró su precio muy alto, no porque no fuera comparable que al igual que las demás se pudiera ajustar en comparación con el sujeto. Según declaró: "la única que había más alta en valor era esa, se iba por encima de la anterior que era la de $48.00..." "...se ve recién restaurada". En este caso la compraventa se realizó el 21 de marzo de 2021 mientras que tasación del Sr. Víctor Isidor se realizó más de dos años después de dicha compraventa, el 30 de junio de 2023 por lo que su inspección de la propiedad fue estando dicha propiedad ya restaurada. Aun así, pudo haberla utilizado considerado su estado o condición al momento de la compraventa y realizar ajustes como en efecto hizo con otras compraventas que consideró muy superior, muy inferior o que ni tan siquiera existían al momento de la expropiación.

19. Declaró que todas sus compraventas están próximas al sujeto más sin embargo, cercanía no garantiza similitud, lo importante es que estén en el mismo vecindario establecido y or supuesto, sean semejantes. En este caso

las compraventas de ambos peritos están localizadas en el casco urbano del Pueblo de Bayamón.

20. El tasador Víctor R. Isidor también utilizó el método de capitalización de ingresos porque la propiedad por su mejor uso y características puede ser es generadora de rentar o ingresos. Durante el interrogatorio directo el tasador Isidor Rodríguez declaró sobre el método de ingresos que desarrolló en su Informe de Valoración y cuyos pasos siguió al igual que el perito de la Parte con Interés. El tasador Víctor Isidor reiteró en el contrainterrogatorio que el método de ingresos es un método especulativo. A preguntas del Tribunal de por qué lo desarrolla si no lo va a usar, el testigo declaró que puede corroborar y sustentar el valor del método de ventas comparables. Declaró que se puede descartar dicho método de ingresos ya que no basó su opinión de valor en él, pero que sirve para sostener el valor de la propiedad.

21. Durante el contrainterrogatorio, el tasador Víctor R. Isidor declaró que no vio la propiedad sujeto al momento de la expropiación ni cuando estaba en posesión de la Parte con Interés si no después, cuando estaba en posesión del Peticionario ya que no había sido contratado por este a ese momento. La fecha de preparación de su Informe de Valoración es de 30 de junio de 2023, esto es un año después de la expropiación.

22. Durante el contrainterrogatorio el tasador Víctor R. Isidor declaró que no vio al sujeto antes de la expropiación ni cuando el sujeto estaba ocupado por la Parte con Interés sino después de haber sido entregada al Peticionario. Este fue contratado como segundo tasador en el caso casi un año después de haberse efectuado la expropiación. Sobre las condiciones del sujeto al momento de la expropiación y antes de ser entregada al Peticionario se dejó llevar en parte por fotografías de otras personas.

23. Declaró que el sujeto puede tener un mejor uso institucional más ninguna de sus compraventas tiene este uso.

24. Admitió que la compraventa uno (1) y dos (2) utilizadas en su Informe de Valoración bajo el método de ventas comparables, ocurrieron después de la fecha de la expropiación y que a esa fecha no existían.

25. Declaró que una diferencia sustancial como sería utilizar una propiedad con una cabida de más del doble de la propiedad valorada no es suficiente para descartarla. En otras palabras, entiende que la cabida de la compraventa dos (2) que es de 14,711 pies cuadrados es comparable con la del sujeto que es, según este midió, de 6,517 pies cuadrados.

26. En cuanto a la comparable dos (2) admitió que utilizó la reventa que ocurrió el 21 de septiembre de 2022 cuando la propiedad había sido sustancialmente mejorada. Por eso la considera bien diferente y superior al sujeto. En cuanto a esta compraventa admitió además, que no existía al momento de la expropiación porque la transacción de compraventa ocurrió después.

27. La compraventa tres (3) que se dio por $350,000.00 y es de dos niveles como el sujeto y que tiene una cabida de 7,195 pies cuadrados vis a vis los 6,517 pies cuadrados del sujeto, la consideró un poco superior a pesar de que el sujeto es de menor cabida y haber declarado en varias ocasiones que a menor cabida más superior es la

propiedad o su valor debido a los costos por construcción que son mayores.

28. En cuanto a la comparable uno (1) admitió que el área de construcción del edificio ocupa la totalidad del terreno, en cuanto a la comparable dos (2) fue impreciso respecto a la cabida del área libre de construcción, en cuanto a la comparable la tres (3) igualmente admitió que el área de construcción del edificio ocupa casi la totalidad del terreno. Admitió que el sujeto al igual que la comparable tres (3) cuenta con estacionamiento para el público, aunque no sea dentro de la cabida de las propiedades. Admitió que la comparable tres (3) está afectada por las mismas influencias del vecindario que el sujeto y las mismas facilidades y servicios. Al igual que el sujeto tampoco es inundable y al igual que el sujeto su configuración o forma es regular. Al igual que el sujeto tiene la misma calificación o zonificación. Igualmente, al momento la compraventa tres (3) tiene un mejor uso comercial institucional que, según este, es igual que el sujeto. Declaró que al igual que el sujeto su condición es promedio con necesidad de algunas reparaciones. Indicó que la tres (3) no tienen mejoras conocidas a diferencia del sujeto que sí las tiene. En esta propiedad, al igual que el sujeto, su estructura ocupa todo el terreno donde enclava por lo que, el ajuste por cabida no procedería ya que ambas ocupan todo el terreno. En la compraventa cuatro (4) del Informe del tasador Isidor el área de construcción es de 3,863 pies cuadrados e indica que es superior, aunque ocupe todo el terreno donde enclava, al igual que el sujeto. En la compraventa cinco (5) es inferior al sujeto en que es inundable, porque no ubica en el centro del casco urbano de Bayamón frente a la Plaza de Recreo y a diferencia del sujeto es de tres (3) niveles. Tiene un área de construcción de 4,806 pies cuadrados en un terreno de 149.73 metros cuadrados y desconoce si hay un "encroachment" pero admitió que la estructura ocupa todo el terreno.[8]

De conformidad con lo anterior, el foro *a quo* resolvió que el valor por unidad del sujeto debe fundamentarse en el precio ajustado de la comparable uno (1) sometida por el perito Zayas Rivera. En vista de ello, estableció que la justa compensación por la propiedad corresponde a la suma de trecientos noventa y seis mil ochocientos cuarenta dólares ($396,840.00) más los intereses acumulados, que no se consignaron al momento de la expropiación.

Oportunamente, el 23 de diciembre de 2024, el Municipio de Bayamón presentó una *Moción de Reconsideración; Enmiendas y Determinaciones Iniciales Adicionales*.[9] Señaló que el foro primario descansó en la venta número uno (1) seleccionada por el perito de

---

[8] *Íd.*, págs. 6-21
[9] *Íd.*, págs. 30-48.

la Parte con Interés, la cual fue realizada un (1) año antes de la expropiación. Por tanto, arguyó que la valoración no es cónsona con la tendencia en el mercado. En vista de tales argumentos, solicitó la reconsideración del valor atribuido a la propiedad objeto del litigio según el informe rendido por el tasador Isidor Rodríguez.

El 26 de diciembre de 2024, la Parte con Interés sometió una *Oposición a Moción de Reconsideración; Enmiendas y Determinaciones Iniciales y Adicionales*.[10] Argumentó que el resultado del foro primario descansó en un análisis profundo, sosegado y científico de toda la prueba que desfiló en el juicio en su fondo. Precisó que la determinación responde a los métodos desarrollados y las declaraciones de los peritos. Adujo que el tribunal no está obligado a establecer su determinación en la declaración del perito del Municipio de Bayamón. Al contrario, sostuvo que el juzgador de los hechos tiene libertad para adoptar su criterio en la apreciación y la valorización de la prueba.

Examinados los argumentos de las partes, el foro *a quo* dictó *Resolución* el 7 de enero de 2025, notificada al día siguiente, en la cual declaró *No Ha Lugar* la reconsideración peticionada.[11]

Inconforme, el 5 de marzo de 2025, el Municipio de Bayamón recurrió ante este foro intermedio apelativo mediante *Apelación Civil*. En su recurso, presentó los siguientes señalamientos de error:

1. Erró el Honorable Tribunal al dictar sentencia tomando solo en consideración la venta de valor más alta de marzo 21 de 2021, 15 meses antes de la fecha de expropiación la cual no representa el valor en el mercado de la propiedad objeto de expropiación descartando las demás ventas comparables.

2. Erró el Tribunal de Primera Instancia al descartar como comparables las ventas 1 y 2 del informe de valorización de la parte peticionaria sobre la base de que las mismas son posteriores a fecha de incautación sin considerar la contemporaneidad entre estas y la fecha de incautación.

3. Erró el Tribunal de Primera Instancia al considerar como *rooftop* (azotea) y la subestación eléctrica del sujeto le añade valor a la misma sin considerar que la prueba admitida demostró que la azotea no tenía uso comercial

---

[10] *Íd.*, págs. 50-53.
[11] *Íd.*, págs. 54.

alguno y que no hubo evidencia de que la subestación estuviera funcionando a la fecha de la expropiación.

Con posterioridad, el 14 de marzo de 2024, el Municipio de Bayamón sometió una *Moción para Presentar la Transcripción de la Prueba Oral*. Presentado su escrito apelativo, el 19 de marzo de 2025, esta Curia emitió *Resolución* en la que concedió el término de diez (10) días para exponer sus objeciones en torno a la transcripción. A su vez, se decretó que una vez transcurriera dicho término, las partes presentaran sus correspondientes alegatos dentro del plazo de treinta (30) días.

En cumplimiento, el 21 de abril de 2024, el Municipio de Bayamón sometió su *Alegato Suplementario*. Concedida una prórroga a esos fines, el 19 de mayo de 2025, la Parte Apelada radicó su *Alegato en Oposición a Apelación y a Alegato Suplementario del Apelante*. Con el beneficio de la comparecencia de las partes, procedemos a discutir el marco legal pertinente a la controversia ante nuestra consideración.

## II.

### A. *Justa compensación por razón de expropiación forzosa*

La Carta de Derechos de la Constitución de Puerto Rico reconoce el derecho fundamental al disfrute de la propiedad. Art. II, Sec. 7, Const. PR, LPRA, Tomo I. En virtud de esta garantía constitucional, "no se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de justa compensación y de acuerdo con la forma provista por ley". Art. II., Sec. 9, Const. PR, LPRA, Tomo I. No obstante, el derecho propietario no es absoluto ante el poder de dominio eminente del Estado en beneficio del bienestar general. *AAA v. Cortés Flores y otros*, 2024 TSPR 96, 214 DPR ___ (2024).

En armonía con lo anterior, la Ley General de Expropiación Forzosa, Ley de 12 de marzo de 1903, según enmendada, 32 LPRA sec. 2901, ("Ley de Expropiaciones") dispone las normas para llevar

a cabo una expropiación. A esos efectos, la Sección 4 de la legislación precitada establece el siguiente trámite judicial:

> La demanda podrá ir dirigida contra los dueños de la propiedad, sus ocupantes y todas las demás personas con derecho o interés sobre la misma; o podrá ir dirigida contra la propiedad en sí. Cuando ocurriere esto último, en la demanda se mencionarán, hasta donde sea posible al demandante determinarlo, los nombres de todas aquellas personas que, como dueños, ocupantes, o poseedores de cualquier derecho o interés sobre la propiedad deben ser notificados del procedimiento a los fines del derecho que puedan tener a la compensación que se fije por el valor de la propiedad expropiada, o a los daños que el procedimiento ocasione. 32 LPRA sec. 2905.

Este trámite legal es un procedimiento *in rem*, es decir, contra la propiedad, por lo que, es un requisito acumular a las personas que ostentan un derecho sobre el bien objeto de expropiación. *Adm. Terrenos v. Ponce Bayland*, 207 DPR 586, 603-604 (2021). Véase, también, la Regla 58.3(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 58.3(b). Para ello, es requisito que la entidad gubernamental inicie el proceso judicial de expropiación forzosa y consigne el pago de la justa compensación estimada. *AAA v. Cortés Flores y otros, supra.* De acatar tales exigencias, "el título de dominio le queda investido. Transcurrido el procedimiento, el tribunal adjudica la compensación final". *Íd.*

De acuerdo con estos parámetros legales, en estos casos es mandatorio: (1) el pago de la justa compensación, (2) destinar el bien para uso público y (3) proceder con sujeción a las leyes que regulan este procedimiento. *A la Orden Shopping, S.E. v. AEE*, 213 DPR 546, 556 (2024); *Adm. Terrenos v. Ponce Bayland*, *supra*, págs. 603-604. A su vez, el Estado está obligado a compensar al propietario cuando: (1) se ejerce el poder de dominio eminente al presentar un recurso de expropiación; (2) ocurre una incautación de hecho mediante ocupación física, o (3) se reglamenta el uso de una propiedad. *SLG Ortiz-Mateo v. ELA*, 211 DPR 772, 787 (2023). *Aut. Carreteras v. 8554.741 m/c II*, 172 DPR 1050, 1060 (2008). Así pues, "[m]ediante la justa compensación o justiprecio se pretende colocar al dueño de

la propiedad en una situación económica equivalente a la que se encontraba con anterioridad a la expropiación de su propiedad". *Adm. Terrenos v. Corp. Pesquera*, 201 DPR 14, 22 (2018); *Amador Roberts et als. v. ELA*, 191 DPR 268, 278-279 (2014).

En ese sentido, el Tribunal Supremo de Puerto Rico establece qué constituye una justa compensación:

> [U]na compensación es justa si refleja "el valor en el mercado del bien expropiado", es decir, "el precio que un comprador estaría dispuesto a pagar en una venta voluntaria y que un vendedor estaría dispuesto a aceptar, considerando para ello las condiciones en que se halle el bien a la fecha de la expropiación" y el mejor uso de la propiedad en un futuro razonablemente cercano. *Adm. Terrenos v. Ponce Bayland, supra,* pág. 607-608, citando a *E.L.A. v. Fonalledas*, 84 DPR 573, 579 (1962).

En cuanto a la valorización de la propiedad, el elemento determinante no es la fecha de investidura del título —lo cual puede demorar años— sino la ocupación de la propiedad ya sea judicial o extrajudicialmente. *SLG Ortiz-Mateo v. ELA, supra*, pág. 790, citando a *Planta de Cal. Hicaco v. Tribunal Superior*, 103 DPR 385, 387 (1975). A esos fines, "[p]ara determinar el valor en el mercado de la propiedad expropiada, el tribunal deberá tomar en consideración todo elemento o indicador que un comprador prudente consideraría". *Adm. Terrenos v. Ponce Bayland, supra,* pág. 608. Véase, también, *Adm. de Terrenos v. Nerashford Dev. Corp.*, 136 DPR 801, 810 (1994).

Otro elemento importante para precisar valor de la propiedad es la contemporaneidad. Así pues, "[e]l informe de valoración que contendrá compraventas contemporáneas a la fecha de valoración, a su vez será contemporáneo o efectivo en una fecha cercana a la expropiación". C. Torres Torres, *La expropiación forzosa en Puerto Rico: ley, jurisprudencia, estudio y guía práctica*, 2002, pág.146. Véase, también, *Autoridad Sobre Hogares de P.R. v. Colón*, 73 DPR 215 (1952). No obstante, "una compraventa que no existía al momento de la expropiación se debe ver con cierto escepticismo,

porque lo que interesa saber es cuál era el valor en el mercado de una propiedad en determinado momento, según las condiciones prevalecientes y en la fecha que fija el acto de expropiación, no después". *Íd.*, pág. 147. Véase, también, *ELA v. 317.813 Cuerdas de Terreno*, 84 DPR 1 (1961).

En este contexto, la parte con interés puede presentar prueba pertinente para precisar la cuantía aplicable a la justa compensación:

> Hemos expresado que cuando la oposición de la parte demandada en un pleito de expropiación forzosa se circunscribe a su inconformidad con la compensación ofrecida por el Gobierno, el peso de la prueba se invierte, siendo entonces el dueño del bien el llamado a demostrar su derecho a obtener una suma mayor. *ELA v. El Ojo de Agua Development*, 205 DPR 502, 520 (2020).

Al atender tales casos, el foro primario debe efectuar el correspondiente análisis probatorio, según discutido en *Adm. Terrenos v. Ponce Bayland, supra,* págs. 616-617:

> La jurisprudencia de este Tribunal ha definido con particular precisión los requisitos de la justa compensación. Se requiere que el Estado pague al dueño el valor en el mercado de la propiedad expropiada, es decir, lo que un comprador prudente ofrecería y un vendedor aceptaría, sin estar ninguno de los dos obligados a comprar o vender, respectivamente. **Para evaluar si la cantidad que el Estado depositó cumple con ese estándar, la Sala de Expropiaciones tiene que considerar "todo elemento o indicador que un comprador prudente consideraría" lo cual requiere tomar en cuenta "las condiciones en que se halle el bien a la fecha de la expropiación [...]". Por lo tanto, el ejercicio de la competencia con la cual se invistió a la Sala de Expropiaciones requiere que reciba y evalúe toda la prueba que sea pertinente a esa determinación y que cumpla con los demás requisitos que establecen las Reglas de Evidencia, 32 LPRA Ap. VI.** (Énfasis nuestro).

Este procedimiento procura garantizar el derecho de las personas a la justa compensación contemplado en la Constitución de Puerto Rico. Según discute el profesor Efrén Rivera Ramos, "la determinación de una justa compensación es esencialmente un ejercicio judicial y no legislativo. Esto supone, pues, que independientemente de lo que dispongan la ley o los reglamentos, los tribunales deberán evaluar si la compensación que resulta es

razonable y hacer la determinación correspondiente". E. Rivera Ramos, *Derecho constitucional: análisis de término*, 71 Rev. Jur. UPR 625, 628 (2009), citando a *Aut. Carreteras v. 8554.741 m/c II, supra.* Para ello, en la sentencia final se resolverá si le asiste al Estado el derecho de expropiación y constará el monto de la justa compensación que deberá recibir la parte con interés, tal como lo ordena la Ley de Expropiación Forzosa, 32 LPRA sec. 2911.

### B. Apreciación de la prueba

En nuestro esquema apelativo, como norma general, no intervenimos en la apreciación de la prueba efectuada por el Tribunal de Primera Instancia. A la luz de este entendido jurídico, la Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". Así pues, un tribunal apelativo debe respeto a la adjudicación de credibilidad del juzgador primario de los hechos, pues solo tiene ante sí los "récords mudos e inexpresivos". *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009). *Trinidad v. Chade*, 153 DPR 280, 291 (2001). Ante la ausencia de error manifiesto, prejuicio, parcialidad o pasión, no se favorece la intervención de los foros apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

Ahora bien, esta normativa no es irrestricta. La deferencia a las determinaciones de hechos cede cuando "éstas carezcan de base en la prueba o cuando se determine que existió pasión, prejuicio o parcialidad". *Moreda v. Rosselli*, 150 DPR 473, 479 (2000). Véase, también, *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62 (1991). En

esa línea, "si de un análisis de la totalidad de la evidencia este Tribunal queda convencido de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas". *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 772 (2013); *Abudo Servera v. A.T.P.R.,* 105 DPR 728, 731 (1977).

### C. *Evaluación de la prueba pericial*

La Regla 703 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 703, dispone la siguiente normativa en torno a los peritos:

(a) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.

(b) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.

(c) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

Sobre este particular, el Tribunal Supremo de Puerto Rico precisa que "[u]n perito es una persona que, a través de la educación o experiencia, ha desarrollado un conocimiento o destreza sobre una materia de manera que puede formar una opinión que sirva de ayuda al juzgador". *S.L.G. Font Bardón v. Mini-Warehouse,* 179 DPR 322, 338 (2010), citando a *Black's Law Dictionary,* 8va ed., Minnesota, Ed. Thomson West, 2004, pág. 619. Como cualquier otro testigo, su función es dar a conocer la verdad derivada de su conocimiento especializado. *Rivera et al. v. Arcos Dorados et al.,* 212 DPR 194, 207 (2023).

En esa dirección, el testigo perito brinda su ayuda al juzgador en el proceso de adjudicación de una controversia, por lo que, la

determinación de su calificación debe producirse mediante un ponderado y juicioso ejercicio de discreción por parte de dicho juzgador. *Díaz v. Pneumatics & Hydraulics*, 169 DPR 273, 293 (2006). La carencia de determinada especialidad afecta el peso de la prueba pericial pero no incide en su cualificación del perito. *Íd.*, pág. 295. Más bien, la evaluación de tal carencia tiene relevancia en la apreciación del valor probatorio de su declaración. *Íd.*

El valor probatorio del testimonio pericial depende del análisis de determinados factores, tales como: (1) si el testimonio está basado en hechos o información suficiente; (2) si el testimonio es el producto de principios y métodos confiables; (3) si la persona testigo aplicó los principios y métodos de manera confiable a los hechos del caso; (4) si el principio subyacente al testimonio ha sido aceptado generalmente en la comunidad científica; (5) las calificaciones o credenciales de la persona testigo, y (6) la parcialidad de la persona testigo. *S.L.G. Font Bardón v. Mini-Warehouse, supra*, pág. 344. Véase, también, *Dye-Tex Puerto Rico, Inc. v. Royal Ins. Co. of Puerto Rico, Inc.*, 150 DPR 658 (2000).

Es menester destacar que, este análisis probatorio está sujeto a la apreciación que emita el juzgador de los hechos, lo cual, como norma general, merece nuestra deferencia. No obstante, en cuanto a la prueba pericial destacamos que no estamos obligados a seguir indefectiblemente la opinión, el juicio, la conclusión o la determinación de un foro adjudicativo. Ostentamos plena libertad de adoptar nuestro criterio propio en la apreciación o la evaluación de la prueba pericial e incluso podemos descartar la misma aunque resulte ser técnicamente correcta. *Culebra Enterprises Corp. v. E.L.A.,* 143 DPR 935, 952 (1997). Igual norma aplica a la evaluación de prueba documental en cuyo caso estamos en idéntica posición que el juzgador de los hechos. *Trinidad v. Chade, supra*, pág. 292.

**III.**

Amparado en su derecho a la revisión judicial, el Municipio de Bayamón nos invita a revocar la *Sentencia* apelada en torno a la valorización del bien inmueble expropiado. Argumenta que la cantidad por la cual el perito de la Parte Apelada valoró la propiedad objeto del litigio no refleja adecuadamente las características reales de esta a la fecha de la expropiación. Arguye que el foro primario erró al descartar las ventas comparables seleccionadas por los tasadores. Ante esas alegaciones, sostiene que la apreciación de la prueba se distancia de la realidad fáctica.

Por su parte, la Parte Apelada asevera que la cuantía concedida en justa compensación resulta típica al mercado según el informe rendido por el tasador Zayas Rivera. Sostiene que la determinación impugnada es correcta, toda vez que responde al análisis judicial fundamentado en las características físicas de la propiedad, sus mejoras adicionales y su uso comercial. Arguye que el foro *a quo* concluyó acertadamente la justa compensación a la luz del examen probatorio.

Luego de evaluar sosegadamente el expediente ante nuestra consideración, resolvemos que la cuantía concedida refleja el valor el mercado. En efecto, garantiza el derecho constitucional a una justa compensación. Por tanto, nos corresponde ser deferentes a la determinación cuestionada por la Parte Apelante. Esta descansa en amplio material probatorio y no se aparta de los parámetros legales discutidos. ***Veamos.***

En la atención de este recurso, abordaremos los señalamientos de error por separado a los fines de discutir con cuidado cada argumento técnico levantado por el Municipio de Bayamón. Para ello, orientaremos nuestro ejercicio revisor a la evaluación de la prueba pericial (documental y oral) presentada por

los tasadores de ambas partes. Así anticipado, pasemos a resolver la controversia que nos ocupa.

En el primer señalamiento de error, el Municipio de Bayamón argumenta que incidió el foro primario a conceder la justa compensación a base de la venta comparable número uno (1) correspondiente a la fecha del 21 de mayo de 2021 presentada por el perito de la Parte Apelada. Considera que dicha venta no refleja el valor del mercado por ser remota a la expropiación. No le asiste la razón.

A la luz del informe denominado *Appraisal Report of a Commercial Property*[12] elaborado por el tasador Zayas Rivera[13], este brindó una amplia declaración sobre la descripción del bien inmueble expropiado:

> P ¿En qué consiste la propiedad que valoró?
>
> R. Es una propiedad en concreto armado y bloque, de dos niveles, y tiene tres mil novecientos dieciséis (3,916) pies cuadrados en el primer nivel, dos mil seiscientos noventa y ocho pies cuadrados (2,698) en el segundo.
>
> HON. JUEZ
> Repítame de nuevo, por favor. ¿Primer nivel?
>
> TESTIGO
> Tres mil novecientos dieciséis pies (3,916) pies cuadrados.
>
> HON. JUEZ
> ¿Tres mil novecientos (3,900)?
>
> TESTIGO
> Tres mil novecientos dieciséis (3,916).
>
> HON. JUEZ
> ¿Y segundo nivel?
>
> TESTIGO
> Dos mil seiscientos noventa y ocho (2,968).
>
> HON. JUEZ
> Veintiséis noventa y ocho (2, 968).
>
> TESTIGO
> Exacto. Para un total de seis, seis, catorce (6,614), seis mil seiscientos catorce (6,614).

---

[12] Véase Apéndice de la Parte Apelante, págs. 159-231.
[13] Surge de la declaración de este perito que preparó dicho informe el 24 de septiembre de 2023, revisado el 2 de febrero de 2024, pues la Parte Apelada lo contrató en diciembre de 2022. No obstante, sostuvo que la fecha efectividad de la valoración de la propiedad corresponde al 29 de junio de 2022. Véase, Transcripción de la Prueba Oral, pág. 75, línea 20-23; pág. 76, línea 1-9.

HON. JUEZ
Seis mil seiscientos catorce (6,614).

TESTIGO
Anjá.

LCDA. TORRES-TORRES

¿Catorce qué?

R. Pies cuadrados de construcción. En adición tiene un *rooftop*, una azotea de dos mil ciento diez (2,110) pies cuadrados aproximadamente.[14]

En atención a esta descripción, el perito Zayas Rivera seleccionó la venta comparable uno (1), la cual catalogó como semejante a la propiedad objeto del litigio. A esos efectos, establecemos que la venta comparable impugnada por la Parte Apelante fue debidamente evaluada en el informe rendido por el perito Zayas Rivera. En esa dirección, puntualizamos que la fecha de la venta comparable número uno (1) seleccionada por este es contemporánea a la expropiación, es decir, no es remota. En cambio, las ventas comparables seleccionadas por el perito de la Parte Apelante, no se ajustan al valor del mercado por ser posteriores a la expropiación, según discutiremos próximamente.

Además, resaltamos que la venta comprable número uno (1) seleccionada por el perito de la Parte Apelada no solo cumple con el criterio de contemporaneidad. También exhibe las semejanzas en cuanto a aspectos físicos, culturales y de uso con el bien inmueble en cuestión. Al respecto, surge de la prueba oral y documental sometida que el perito Zayas Rivera catalogó como semejante al bien expropiado la venta comprable número uno (1) a base de los siguientes renglones recogidos en el informe: (1) *location*, (2) *story*, (3) *zoning*, (4) *parking*, (5) *parking* ratio, (6) *additional improvements*, (7) *flood*, (8) *size*.[15] Únicamente distinguió que la referida venta comparable no es semejante con la propiedad en cuestión en las

---

[14] Véase, Transcripción de la Prueba Oral, pág. 76, líneas, 21-23; pág. 77, líneas, 1-23; pág. 78, línea 1-5.
[15] Véase, Apéndice de la Parte Apelante, pág. 216.

categorías de *condition* y *corner site* por considerarse en estos aspectos superior.

Por consiguiente, enfatizamos que la venta comparable número uno (1) refleja adecuadamente el valor del mercado. Así pues, no incidió el foro *a quo* al fundamentar su dictamen en esta comparable. En vista de ello, concluimos que el hecho de que la venta comparable número uno (1) se haya celebrado el 21 de marzo de 2021 no impide que el foro primario la considere para determinar el justo valor del mercado del bien expropiado.

Discutido lo anterior, nos corresponde atender el segundo señalamiento de error. En este el Municipio de Bayamón sostiene que erró el foro primario al descartar las ventas comparables uno (1) y dos (2) presentadas por el perito Isidor Rodríguez. No nos persuade tal argumento.

En contraste a lo indicado por la Parte Apelante, una lectura cuidadosa del *Informe de Tasación*[16] sometido por el perito Isidor Rodríguez nos revela que estas ventas comparables no se ajustan al valor del mercado por resultar posteriores a la expropiación, es decir, no existían al momento de la expropiación. Además, estas ventas no son semejantes al bien expropiado, toda vez que no exhiben los elementos esenciales que este posee tales como la subestación eléctrica y la azotea (*rooftop*), los cuales discutiremos más adelante. Sobre este particular, destacamos que en el informe vertido por el tasador Isidor Rodríguez se alude a la ventas comparables uno (1) y dos (2) que tuvo ante su consideración. Surge de este documento que, el 9 de septiembre de 2022 se celebró la compraventa de la comparable uno (1) por el precio cierto de doscientos cuarenta mil dólares ($240,000.00).[17] Asimismo, consta que la compraventa de la comparable dos (2) corresponde a la fecha

---

[16] *Íd.*, págs. 62-158.
[17] *Íd.*, pág. 107.

de 21 de septiembre de 2022 por el precio cierto de quinientos sesenta y seis mil dólares ($556,000, 00).[18]

No obstante, en atención a estas ventas comparables, durante la celebración del juicio el perito Zayas Rivera indicó que las descartó de su análisis por la siguiente razón:

> P ¿Dónde usted entiende que estriba la diferencia que hay entre ambos informes de valoración?
>
> R Bueno, yo diría que en la selección de comparables.
>
> P ¿Por qué?
>
> R Bueno, hay unas comparables que el colega utilizó que yo no las hubiera utilizado.
>
> P ¿Por qué?
>
> **R Varias de ellas no representan el valor en el mercado.**
>
> P ¿A qué usted se refiere con eso?
>
> R Bueno, hay dos de ellas que la fecha de cierre que se hizo la venta fueron posteriores a la fecha de expropiación. Hay una de ellas que también la compraron para uso residencial, hay otra que quien compró fue el inquilino, o sea, que la propiedad no estuvo listada, no estuvo en el mercado abierto la compró un inquilino, y hay otra que tiene como catorce mil setecientos (14,700) pies cuadrados él estimó, y eso es una propiedad más del doble del sujeto, muy diferente, tiene dos locales comerciales abajo, cuatro apartamentos arriba, una propiedad muy diferente al sujeto. (Énfasis nuestro).[19]

Ante este contexto, notamos que el foro primario concedió atinadamente valor probatorio a la prueba pericial vertida por el tasador Zayas Rivera, quien identificó que la venta comparable uno (1) de su informe se ajusta de modo adecuado a la propiedad objeto del litigio. Precisamos que en el *Informe* del perito de la Parte Apelada consta la siguiente información en torno a la comparable uno (1):

> *Sale 1 refers to a two-stories commercial property with an estimated area 7,402 square feet, located on the core town of Bayamón. It was sold on March 21, 2021, for $500,000, equivalent to $68 per square foot. When compared to the subject it is considered superior in terms of condition and corner lot. It is considered similar on all other attributes. Therefore, it has an overall Superior comparability. Then, the subject unit value should be below this comparable unit value.*[20]

---

[18] *Íd.*, pág. 109.
[19] Véase, Transcripción de la Prueba Oral, pág. 142, líneas 20-23; pág. 143, líneas 1-15.
[20] Véase, Apéndice de la Parte Apelante, pág. 214.

De manera consistente con esta información descriptiva, el perito Zayas Rivera declaró ante el foro primario lo siguiente:

P Okay. Vayamos entonces a la próxima página cincuenta y nueve (59).

R ¿Dónde usted aquí en esta página, dónde se posiciona conforme a esta página cincuenta y nueve (59), dónde posiciona el sujeto valorado entre estas tres propiedades comparables?

R. Okay. Después que hacemos todo este análisis cualitativo de superioridad e inferioridad, lo que queremos hacer es ajustar las comparables al sujeto porque no hay una propiedad similar, solamente semejante.

**Por lo tanto, hacemos esta comparabilidad y de acuerdo... lo mejor que nos explica es la tabla del medio, donde la comparable número uno queda siendo superior con un unitario de sesenta y ocho dólares ($68.00).**

La comparable dos queda inferior con un valor de cuarenta y nueve dólares ($49.00), el pie cuadrado, y la comparable número tres queda mucho más inferior con un valor de treinta y seis ($36.00) el pie cuadrado. **Y nosotros nos ubicamos entremedio de la comparable uno y dos de acuerdo al análisis que hemos explicado anteriormente.**

P Conforme a ese análisis, ¿cuál usted entiende qué es el valor por unidad por pie cuadrado que tiene el sujeto?

R Sesenta dólares ($60.00).

P Y entonces, ¿a qué valor total para este propiedad sujeto nos lleva un unitario de sesenta dólares ($60.00) el pie cuadrado?

R, Pues eso nos da a trescientos noventa y seis mil ochocientos cuarenta ($396,840.00) que se redondea a cuatrocientos mil dólares ($400,000.00).

P ¿Es típico que los tasadores redondeen o no?

R Es típico.

HON. JUEZ
¿Trecientos noventa y seis (396)?

TESTIGO
Ochocientos cuarenta (840), sí.

LCDA. TORRES-TORRES
¿Cómo usted obtuvo esa cantidad? Después que usted entiende que vale sesenta dólares ($60.00) el pie cuadrado, que ese es su valor, ¿cómo usted llega a los trescientos noventa y seis mil ochocientos cuarenta dólares ($396,840.00)?

R Multiplicándole el área del edificio que son seis mil seiscientos catorce (6,614) por los sesenta dólares ($60.00). (Énfasis nuestro).[21]

---

[21] Véase, Transcripción de la Prueba Oral, pág. 177, líneas 19-22; pág. 118, líneas 17-21; pág. 119, líneas 1-23.

Mediante este análisis debidamente explicado en sus declaraciones, el foro primario concluyó conforme a la ley el valor ajustado de la propiedad con el fin de  garantizar el derecho constitucional a la justa compensación. No obstante, somos conscientes que la valorización del bien inmueble expropiado no se limita a la venta comprable uno (1) seleccionada por el tasador Zayas Rivera.

Con el objetivo de abordar este asunto, procedemos a atender el tercer señalamiento error. En este, el Municipio de Bayamón aduce que incidió el foro primario al considerar en su determinación el hecho de que el edificio expropiado tiene una azotea (*rooftop*) y una subestación eléctrica. Nuevamente, no le asiste la razón a la parte Apelante.

Como antes indicamos, en el proceso de justipreciación, el perito Zayas Rivera sopesó diversos elementos vinculados con la propiedad en cuestión. Por tanto, precisamos que la determinación emitida impugnada responde correctamente al hecho de que el bien expropiado presenta una subestación eléctrica y una azotea (*rooftop*):

> LCDA. TORRES-TORRES
> Sí, sí. Le pregunto, ¿qué importancia tiene para un edificio contar con una subestación.
>
> R Una subestación eléctrica…
>
> HON. JUEZ:
> Para efectos de valorización.
>
> LCDA. TORRES TORRES
> Exactamente.
>
> R Para efectos de valorización al edificio le da más valor porque el edificio puede obtener, operar, operaciones más intensas que requieran mayores cargas eléctricas. Por lo tanto, una subestación eléctrica es favorable.
>
> HON. JUEZ
> ¿Y usted la tomó en consideración para el valor que emitió de cuatrocientos mil dólares ($400,000.00)?
>
> TESTIGO
> Sí, su señoría.
>
> HON. JUEZ

Okay.

LCDA. TORRES-TORRES
¿Cómo compararía un edificio que tiene una subestación eléctrica de ciento cincuenta (150) KVA con uno que no lo tiene?

R. Bueno, el que la tiene...

P. En término de valor y de demanda por ese edificio.

R. Es superior y recibe más demanda, porque tiene mayor, tiene una gama mayor de clientes que le interesaría para poder poner ciertas operaciones dentro del edificio.

Un edificio no tiene una operación... una subestación a lo mejor usted no puede poner una imprenta, por decir, un ejemplo.[22]

De hecho, en contraste del testimonio pericial de la Parte Apelante, resaltamos que el perito Zayas Rivera destacó las mejoras que contiene la propiedad en cuestión:

P. Okay. ¿Podría describir qué otras mejoras tiene la propiedad usted valoró?

R. Seguro que sí. Bueno, voy a describir el edificio... el primer nivel, que ya estipulamos el tamaño, tiene un layout básicamente abierto típico de los ballroom de los salones de actividades, ese salón básicamente es el salón de los espejuos, porque tiene unos espejos, todas las paredes tienen unos espejos de diez (10) pies de alto; tiene un área de barra, tiene una cocina, tiene dos salones típicos de salones —dos baños, con cubículos cada baño, uno para dama y para caballero; tiene cerámicas en sus pisos, estoy hablando del primer nivel; el techo es parcialmente acústico, tiene una altura de doce (12) pies de alto, mientras que la altura al plafón en el área donde hay acústico es diez pies con tres (10' 3"), obviamente sigue siendo doce (12) pies de alto, pero va con el acústico; y tiene aire central.

La condición general que yo consideré en ese primer nivel fue de promedio buena. El segundo nivel, que ya estipulamos también el tamaño, pues el *layout* son cuatro... tiene cuatro habitaciones, cuatro habitaciones grandes y dos baños. Este estaba siendo usado al momento de mi visita parciamente como almacenaje de utilería del salón de actividades, mantelería, meses, ese tipo de cosas.

El *layout* de este edificio que describí, permite lo mismo el establecimiento de oficinas profesionales o residencial. Tiene una altura de diez pies y siete pulgadas (10' 7") su piso es en vinyl, parcialmente vinyl, y parcialmente concreto sin losas.

Puertas en maderas, y el techo es en concreto y en algunas áreas quedan los remanentes de un acústico, que en algún momento sirvió para algo. No tiene aire acondicionado, pero tiene ventilación cruzada.

La condición de ese segundo nivel yo lo consideré promedio *a fair.*

---

[22] *Íd.*, pág. 80, líneas 13-23; pág. 81, líneas 1-19.

HON. JUEZ
O sea, ¿igual en el primer nivel?

TESTIGO
NO, el primer nivel estaba en mejor condición operando, estaba operando.

HON. JUEZ:
Pero, usted declaró que el primer nivel… declaró promedio a bueno.

TESTIGO
Promedio… *a good* promedio *a good*, el segundo nivel yo lo declaro promedio a *fair*, necesita algunas mejoras para que esté en promedio.

LCDA. TORRES-TORRES
Okay. En el tercer párrafo de la página treinta y siete (37) usted menciona… si es tan amable y nos puede leer ese párrafo, ese parrafito.

R. Okay. "Como mejoras adicionales este edificio tiene un *rooftop* de aproximadamente dos miento diez (2,110) pies cuadrados".

P. ¿Cómo usted sabe que tiene un rooftop?

R. Porque lo visité.

P. Pero, ¿pero cómo uno puede concluir…? ¿Cuál es la diferencia entre un *rooftop* y techo?

R. Ah bueno, porque tiene los alrededores tienen altura o sea, no es un techo que el alero es bajito.

P. ¿Cómo se llega al *rooftop*?

R. Por la misma escalera que tú llegas al segundo nivel.

P. Okay. Continúe, por favor, con la segunda oración del tercer párrafo.

R. "El edificio está *supported*, está —Dios mío el spanglish—.

P Apoyado.

R "Está apoyado por una estación sub-eléctrica. Tiene dos contadores eléctricos, dos contadores de agua. La propiedad es de dos unidades independientes., puede operar como dos unidades independientes.

Esta propiedad según mi investigación, desde aproximadamente mil novecientos noventa y cuatreo (1994) se ha dedicado al salón de actividades con un nombre parecido a Salón de Los Artistas.

La capacidad al momento de mi visita era de ciento veinte (120) personas".[23]

Advertimos que, de no haberse examinado tales aspectos sobre la estructura física, entonces no se hubiera considerado el

---

[23] *Íd.*, pág. 81, líneas 21-23; pág. 82, líneas 1-23, pág. 83, líneas 1-21; pág. 84, líneas 1-23; pág. 85, líneas 1-4.

adecuado valor de la propiedad, lo cual incidiría en el derecho a la justa compensación de la Parte Apelada. Por tanto, actuó correctamente el foro primario al identificar la subestación eléctrica y la azotea como elementos esenciales para la valorización de la propiedad.

Considerada esa gama de factores, el señor Zayas Rivera rindió la siguiente conclusión recogida en su *Informe* de tasación:

> *For the evaluation of the subject property the three valuation method were considered. However, just the Sale Comparison and the Income Approach apply. The Cost Approach does not apply since on the current market there are not investors buying vacant land for development of new building as the subject. Moreover, the subjective characteristic of estimating the depreciation on the Cost Approach make it less reliable. Therefore, the Cost Approach would no create a reliable and credible value. Instead, for intender user reference the replacement cost new (RCN) was developed. The replacement cost new is equal to $730,000; this is not the market view.*
>
> *In the sales comparison approach (SCA), the subject was compared to three competitive properties from the Bayamón core town. Two of them of two stories like the subject and due to the scarcity of sales one of them was three-story. Qualitive adjustment were based on reasonable and supported rationale. Market participants are currently analyzing purchase prices on investment properties as they relate to avaible substitutes in the market. Therefore, the sole comparison approach is considered to provide a very relevant and reliable value indication. The value conclusion using this approach is $400,000.00.*
>
> *Since the subject property is comprised of two independent units it may serve as an income generation property, as it might be rented to two independent tenants as well as a single tenant. Moreover, as per my research along the subject neighborhood some properties are occupied by tenants. Therefore, the Income Approach is also a very relevant and reliable approach. Market data presented are from similar properties in Bayamón core town. The value indication in this approach is based on the theory that value is the presents worth of the future net income generated by the real estate before all debt services, depreciation and income taxes during the period of ownership. The value conclusing using this approach is $400,000.*[24]

Así dispuesto, a tenor con la totalidad de la prueba obrante en el expediente judicial, resolvemos que la suma otorgada en justa compensación es conforme a derecho. Descansa en una evaluación efectuada por el tasador Zayas Rivera, quien es un perito debidamente calificado, que aplicó el método de comparables y el

---

[24] Véase, Apéndice de la Parte Apelante, pág. 66.

método de ingresos a su evaluación.[25] Ello, en efecto, nos dirige a concluir que la prueba pericial oral y documental sometida por la Parte Apelada está fundamentada en información y hechos suficientes, producto de aplicación de métodos y principios confiables, aceptados por el campo científico de la tasación, y exentos de parcialidad. Por consiguiente, no existe el escenario jurídico que nos permita descartar la evaluación pericial efectuada por el foro primario.

Por último, disponemos que la Parte Apelada cumplió con la carga probatoria exigida para reclamar la justa compensación por causa de expropiación forzosa. Así pues, conforme a la prueba desfilada, la cuantía concedida procura colocar a los dueños anteriores en una situación económica equivalente a la que se encontraban previo a la expropiación. A esos efectos, no olvidemos, pues, que la tasación del perito Zayas Rivera pondera el valor en el mercado a base de múltiples factores, entre ellos, la capacidad que tiene la propiedad de generar ingresos.[26] Consistente con ese análisis, el señor Padín Besabe emitió la siguiente declaración durante la celebración del juicio:

> LCDA TORRES-TORRES
> ¿Cómo lo dejó a usted, cómo quedó su patrimonio con esta expropiación?
>
> R Bueno, al quitarme la fuente de ingreso, me dejan en una situación totalmente de… totalmente, fuera de sin ingresos de un negocio establecido después de quince (15) años, esa era mi fuente ingreso para mí y para mi familia. Me destruyó. Sin crédito totalmente.[27]

Por consiguiente, en aras de garantizar el derecho a la justa compensación, nos corresponde ser deferente al dictamen impugnado. No existe un espacio para sustituir el criterio jurídico que adoptó el foro primario. La suma concedida es el precio que un

---

[25] Véase, Transcripción de la prueba oral, pág. 98, líneas 1-23; líneas 1-7.
[26] Véase, Apéndice de la Parte Apelante, págs. 218-223. En este apartado del *Informe*, el tasador Zayas Rivera estudia minuciosamente una serie de rentas comparables al bien inmueble expropiado.
[27] Véase, Transcripción de la Prueba Oral, pág. 63, línea 21-23; pág. 64, líneas 1-3.

comprador estaría dispuesto a pagar en una venta voluntaria y que un vendedor estaría dispuesto a aceptar de acuerdo con las condiciones de la propiedad y sus futuros usos. En vista de lo anterior, nos corresponde confirmar la *Sentencia* objeto de revisión judicial.

**IV.**

Por los fundamentos que anteceden, **confirmamos** la *Sentencia* apelada.

Lo acordó y lo certifica la Secretaria del Tribunal de Apelaciones.


LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones